IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 10, 2026

**STATE OF TENNESSEE v. JACQUE BOUVIER BENNETT**

**Appeal from the Criminal Court for Davidson County**
**No. 2019-A-750      Steve R. Dozier, Judge**

_____

**No. M2025-00342-CCA-R3-CD**

_____

A Davidson County jury convicted the Defendant, Jacque Bouvier Bennett, of aggravated rape of a child, aggravated sexual battery, and assault by offensive touching. The trial court sentenced the Defendant to an effective fifty-year sentence in the Tennessee Department of Correction. On appeal, the Defendant asserts that: (1) the trial court erred when it found the victim competent to testify; (2) the trial court erred when it allowed the victim's mother to be present during the victim's testimony; (3) the trial court erred in admitting the victim's forensic interview; (4) the victim failed to identify the Defendant at trial; and (5) the cumulative effect of these errors undermined the Defendant's right to a fair trial. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Nathan S. Moore, (on appeal), Nashville, Tennessee, and Adam W. Parrish, (at trial), Lebanon, Tennessee, for the appellant, Jacque Bouvier Bennett.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Lauran A. Hogan, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's sexual contact with the then two-year-old victim. A Davidson County grand jury indicted the Defendant for one count of aggravated rape of a child and two counts of aggravated sexual battery. The case proceeded to trial. We summarize the testimony as follows.

Rachel Bragg, the victim's mother, testified that she shared custody with the victim's father, Jason Amburgey. Their custody arrangement gave Mr. Amburgey ten days a month and two weeks in the summer, with the remainder of the time spent with Ms. Bragg. During July and early August of 2018, when the victim was two years old, Mr. Amburgey lived on Gordon Lane ("Gordon Lane") in Hermitage, Tennessee. Mr. Amburgey's eldest daughter, J.A. (the victim's half sister), his mother, Barbara Bennett, and the Defendant, who was his mother's boyfriend, all lived with Mr. Amburgey on Gordon Lane. Ms. Bragg was, however, unaware that the Defendant resided at the Gordon Lane home until after the victim reported the abuse. She was aware that the Defendant was Mrs. Bennett's boyfriend because Mrs. Bennett had introduced the Defendant to Ms. Bragg as her boyfriend on one occasion when Ms. Bragg picked up the victim from Gordon Lane.

Ms. Bragg testified about the victim's disclosure of the abuse, saying that she picked up the victim from Gordon Lane at 7:30 a.m. on August 6, 2018, where the victim had been staying for two days. Mrs. Bennett gathered the victim's belongings and was putting on the victim's shoes when the victim began crying. The victim stated that she wanted to go home. Ms. Bragg thought this a little strange because the victim was typically a happy child and "not a crier." Later that day, Ms. Bragg and the victim watched a movie together. Ms. Bragg wore pajama pants, and the victim tried to pull them off. Ms. Bragg corrected the victim telling her, "that's not polite." The victim laughed and sat down. Soon she became fidgety and when Ms. Bragg looked over, the victim "had . . . her hands in her vaginal area, but a finger actually inside her vaginal opening." Ms. Bragg asked the victim what she was doing, and the victim responded, "what Jacque does to me." Ms. Bragg asked the victim what she meant and the victim said, "he . . . hurted [sic] me, he poked me in my butt" with his finger. Ms. Bragg explained that at two-years old, the victim referred to her vagina as "butt," and she referred to her "buttocks" as "booty" or "her big butt."

Ms. Bragg did not immediately recognize the name "Jacque" due to her brief interaction with the Defendant when Mrs. Bennett introduced him to Ms. Bragg. Ms. Bragg called Mr. Amburgey, because the victim said it had occurred at "daddy's house" and asked if he knew a "Jacque." Mr. Amburgey identified the Defendant, who was by that time his mother's husband. Ms. Bragg identified the Defendant in court as "Jacque."

Ms. Bragg called Vanderbilt Children's Hospital but was directed to Our Kids Center. Ms. Bragg took the victim to Our Kids Center for an examination, and, on the way, the victim said that "Jacque hurted [sic] her throat." When Ms. Bragg asked the victim what she meant, the victim stated that, "he poked it really hard." This was the only comment the victim ever made about her throat. The employees at Our Kids Center explained to Ms. Bragg that they would be referring her to the Department of Children's Services (DCS). Ultimately, a forensic interview was conducted at the Nashville

Children's Alliance. Ms. Bragg stated that she was not in the room during the examination nor did she tell the victim what to say. She told the victim "that we were going to talk to someone that could help keep her safe." Ms. Bragg explained that she did not think that the victim would understand any more detail than what she provided.

Ms. Bragg recalled that, during the interview, the victim exited the interview room to show her a picture she had drawn and then she returned to the interview room. Ms. Bragg said that, initially, the victim spoke of the incident frequently but with time spoke about it less. Ms. Bragg confirmed that the victim had never made another allegation of this nature before or since this incident.

Ms. Bragg testified about changes she had observed in the victim's behavior. In July 2018, she recalled that the victim became "skittish" when being bathed and would tighten her legs. Ms. Bragg thought this was odd until she learned of the Defendant's contact with the victim. The victim toilet trained in the summer of 2017. In the beginning of July 2018, the victim began bed-wetting again. The victim also became resistant to Ms. Bragg wiping her. At the end of June/beginning of July 2017, the victim became apprehensive about going to Gordon Lane. She would cry and tell Ms. Bragg she did not want to go. The victim also began to hide when Mr. Amburgey came to pick the victim up to take her to Gordon Lane. Toward the end of July, Ms. Bragg noticed that the victim began having "scary dreams" and acting like a baby. Ms. Bragg described the victim as becoming "very clingy."

At the end of August 2018, a caregiver notified Ms. Bragg that the victim was playing with her dolls in an "inappropriate way." Ms. Bragg began to watch more carefully and saw that the victim would remove the doll's clothing and poke the vaginal area of the doll. Ms. Bragg testified that the victim engaged in ongoing therapy at the Nashville Children's Alliance for a year after she disclosed the abuse.

On cross-examination, Ms. Bragg confirmed that during the drive to Our Kids Center, she told the victim she was going to see a doctor. In response, the victim cried and said, "I don't want to go, . . . it didn't happen." She explained that the victim was concerned that she was going to be given a shot.

Shelby Mocherman, A Nashville Children's Alliance forensic interviewer, testified as an expert witness in the field of pediatric forensic interviews. Ms. Mocherman conducted a recorded forensic interview with the victim on August 23, 2018. During the interview, the victim disclosed sexual abuse. Ms. Mocherman recalled that "for the most part" the victim appeared to understand the questions asked of her. She recalled that the victim left the room twice, jumped from topic to topic, and did not "sit still" during the interview. In her experience, the victim's demeanor and behavior during the interview was

normal for a child of her age. Ms. Mocherman noted that because children around the age of three do not have a great concept of time, interviewers do not try to "nail down" exact times.

On cross-examination, Ms. Mocherman acknowledged that generally she did not interview children under the age of three. Although technically less than three, the victim was about a week away from her third birthday and demonstrated she was able to answer questions in complete sentences.

Metropolitan Nashville Police Department (MNPD) Detective John Thomas began the investigation into Ms. Bragg's report of sexual abuse. Detective Thomas stated that, after the victim disclosed to her mother, Ms. Bragg contacted Vanderbilt Hospital who referred her to the Our Kids Center. Ms. Bragg took the victim to Our Kids for evaluation on August 6, 2018. Following the Our Kids Center meeting, a DCS referral was made, and Ms. Bragg filed a police report. In connection with this case, Detective Thomas interviewed Ms. Bragg to gather background information on the victim because Ms. Bragg was not a witness to the offense. He also interviewed the victim's father, Mr. Amburgey. A forensic interviewer conducted an interview with the victim at the Nashville Children's Alliance. Detective Thomas was not in the room during the forensic interview but was in a separate room for law enforcement and DCS employees where they can view the interview live.

Detective Thomas confirmed that he attempted to interview Mrs. Bennett, the Defendant's wife, but an attorney contacted Detective Thomas to inform him that Mrs. Bennett did not want to speak with him. Detective Thomas testified about the process for investigating these types of allegations and the different departments involved. He recalled that in this case, DCS substantiated the claims. Separately, the District Attorney's office made the determination to prosecute.

Detective Thomas testified about the process of identifying a suspect in this case. During the forensic interview, Detective Thomas learned that there were three adults living at Gordon Lane – Mr. Amburgey, Barbara Bennett, and the Defendant. The victim indicated that "Jacque touched me," ruling out the other two residents. Thus, the Defendant was developed as a suspect.

On cross-examination, Detective Thomas confirmed that, during the forensic interview, he heard the victim say that the Defendant "put a hole in it" and "it blew up." The victim gestured toward her genitals, leading Detective Thomas to believe the victim was referring to penetration. Throughout the investigation the victim's statements were consistent. The victim never indicated any other body parts were touched, nor did she ever identify any perpetrator other than the Defendant.

4

Lori Littrell, a nurse practitioner employed at Our Kids Center, testified as an expert witness in the field of pediatric forensic medical evaluations. Ms. Littrell conducted the medical forensic evaluation of the victim on August 5, 2018. During the examination, she found a "labial adhesion" which is a "nonspecific finding" often found in children the victim's age. Ms. Littrell described the label adhesion as a "skin irritation." Ms. Littrell did not find any injury to the victim. Ms. Littrell explained that the absence of injuries did not rule out sexual abuse and that normal examinations with no injury were common in these types of exams. She stated that approximately five to seven percent of children evaluated will have injury. Several factors contributed to the low percentage of injury findings, one of which was the timing of the disclosure as children often do not disclose immediately. Another factor was that some types of contact may not cause injury. With child sex assault, generally the perpetrator was someone known to the victim and the act was done without the intent to cause injury.

Samantha Barnhill, the victim's maternal grandmother, testified that she watched the victim two to three times a week when Ms. Bragg was working. Following the allegations in this case, she observed changes in the victim. She described the victim as "always cheerful and happy" before the abuse but said that she became "mopey" after. She was not as interactive and did not want to play. When Ms. Barnhill assisted the victim with using the bathroom, the victim would "flinch" when Ms. Barnhill would wipe the victim. Ms. Barnhill also noted that, following the disclosure, the victim regressed in her toilet training.

Next the State called the victim to testify and outside the presence of the jury questioned the victim for purposes of competency as follows:

> [State]: . . . Do you know the difference between telling the truth and telling a lie?
>
> [Victim]: Yes.
>
> [State]: And is it bad to tell a lie or good to tell a lie?
>
> [Victim]: Bad.
>
> [State]: Bad, okay. If I asked you how many fingers I was holding, what would you say?
>
> [Victim]: One.

[State]:        And if I told you I was holding up seven fingers, would that be the truth or the lie?

[Victim]:       A lie.

[State]:        And when you sit up in this chair, do you understand we are only going to tell the truth?

[Victim]:       Yes.


    Defense Counsel then questioned the victim as follows:

[Defense]:      . . . . How old are you?

[Victim]:       I'm five.

[Defense]:      You're five. Okay. And [the State] asked you about the difference between you telling a lie and telling the truth, right?

[Victim]:       Right.

[Defense]:      And tell the difference -- can you tell us what the difference is?

[Victim]:       Hmm --

The Court:      If he asked you: What does telling the truth mean?

[Victim]:       Um...don't.

The Court:      You don't know?

[Victim]:       No, I don't know.

[Defense]:      You don't know what it means to tell the truth?

[Victim]:       No.

[Defense]:      Do you know what it means to tell something that's not true?

[Victim]:       No.

| [Defense]: | Do you know what happens if you don't tell the truth? |
|---|---|
| [Victim]: | Yes. |
| [Defense]: | What's that? |
| [Victim]: | You get in trouble. |
| [Defense]: | Get in trouble. |

The trial court then had the following exchange with the victim:

| The Court: | Do you understand – [the State] asked you about, if you sit in that chair, you have to tell everything that's true? |
|---|---|
| [Victim]: | Yes. |
| The Court: | You can't tell a lie, do you understand that? |
| [Victim]: | Yes. |
| The Court: | Do you promise to tell the truth? |
| [Victim]: | Yes. |

Following this exchange, the Defendant argued that the victim did not have the ability to discern the difference between the truth and a lie because she could not "articulate" "an untruth." The Defendant argued that "the statute and the Rule" "requires that [the victim] be able to explain the difference between truth and untruth, right and wrong." The State responded that the victim is not required "to define the word truth or untruth." The State recounted that the victim stated that she would get in trouble for telling a lie and that she would not lie. The trial court allowed the victim to testify, finding that the victim, "exhibited knowing the difference between the truth and [a] lie and has sa[id] she, while she's here, will only tell the truth and promise[d] to do that." The trial court also noted that "[Rule] 603 doesn't require [the victim] to explain what the truth or a lie is."

The Defendant then requested that the victim's mother be removed from the courtroom during the victim's testimony to prevent "undue influence" such as "potential signaling or nodding." The trial court denied this request, the jury returned, and the State called the victim to testify.

The State asked the victim her name and her age, then asked questions about truthfulness as follows:

[State]:     Do you know the difference between the truth and a lie?

[Victim]:    No.

[State]:     Well, is it good to tell a truth?

[Victim]:    Yes.

[State]:     Is it good to tell a lie?

[Victim]:    No.

[State]:     Okay.  Is it bad to tell a lie?

[Victim]:    Yes.

[State]:     What happens if you tell a lie?

[Victim]:    You get in trouble.

[State]:     If I ask you how many fingers [I] am holding up, what would you say?

[Victim]:    One.

[State]:     If I told you that I was holding up seven fingers, would that be the truth or a lie?

[Victim]:    Lie.

[State]:     And when you sit in that chair right there, do you promise that you will tell the truth?

[Victim]:    Yes.

[State]:     Okay.  And you won't tell any lies, right?

8

[Victim]:     Right.

The trial court then asked the victim if she was promising to tell the truth, and she answered in the affirmative. The State asked the victim if she was "a little bit scared," and the victim answered, "yes." After some preliminary questioning, the State asked the victim if she remembered when "Nana" lived at Gordon Lane. The victim did and recalled that the Defendant, who was "Nana's husband" also lived at the house. The victim testified about an interaction with the Defendant saying that the Defendant, "sticked [sic] his finger in my vagina" on more than one occasion. She said that the Defendant had done this to her in the bathroom and also in the bedroom. The victim said that no one else was present during these incidents and that this contact made her feel "bad."

The victim remembered watching the forensic interview video with the prosecutor the week before trial. She confirmed that she was in the video. The State gave the disc to the victim, and she identified the recording as the same that she had watched with the prosecutor. She explained that she knew it was the same disc because she had written her name on the disc.

On cross-examination, the victim testified that, at the time of trial, she lived with her mother in Dickson, Tennessee. She said that her father, at the time of trial, had moved to Nashville where he lived with his wife and two children. The Defendant's attorney questioned the victim about her memory and who had told the victim why she was in court. Defense counsel asked if anyone had told the victim why she was in court and the victim said, "No." As to questions about what she received for her birthday or Christmas last year, the victim stated she did not know. She confirmed that she watched the video several days before court and that she was in the video. She stated, however, that she could not remember what she talked about in the video. The Defendant interjected and asked why Ms. Bragg and her mother were nodding their heads. The trial court responded to the Defendant, "Okay. If you will be quiet. The jury can see everything that's happening here." Defense counsel resumed questioning, and the victim stated that she did not remember what the prosecutor had asked her about on direct examination. The Defendant's attorney concluded his cross-examination and renewed his objection to the victim's competency based upon the victim's responses to his questions.

The State played the forensic interview for the jury. During the interview, the victim disclosed that "Jacque" touched her. She said that the Defendant "poked a hole in it" and "it blew up." The victim told the interviewer that "Jacque," (the Defendant) and "Nana" (Mrs. Bennett) lived at "Daddy's (Mr. Amburgey) house." The victim stated that the touching occurred when Mr. Amburgey and Mrs. Bennett were at work, and the Defendant touched her in "Nana's bedroom." She stated that the Defendant used his finger. When asked where the Defendant touched the victim, the victim said "butt," but she physically

pointed to her vagina. When asked if the Defendant touched her anywhere else, the victim pointed to her buttocks. The victim told the interviewer that she does not see the Defendant anymore.

The Defendant presented Mr. Amburgey to testify on his behalf. Mr. Amburgey testified that he had primary custody of his oldest daughter, JA, (the victim's half sister) and that his mother had moved into Gordon Lane to help him with JA. At some point, the Defendant moved in and shared a bedroom with Mrs. Bennett. Mr. Amburgey stated that "generally" he did not have "time" with the victim if he was scheduled to work. He explained that Mrs. Bennett would care for the victim if Mr. Amburgey got called in to work or if he needed to go somewhere. He stated these occasions were for short periods of time such as an hour or two. He confirmed that the Defendant had a job during the time he resided at Gordon Lane, but Mr. Amburgey could not recall the Defendant's work schedule. Mr. Amburgey stated that he could not recall a time when the Defendant was left alone with the victim. Upon further questioning, Mr. Amburgey clarified that he had left JA and the victim with the Defendant while Mr. Amburgey briefly went to a gas station.

Mr. Amburgey testified that his son MA was born on May 4, 2018, and that he was "on FMLA" (Family Medical Leave Act) from May 4 until mid-July. He agreed that he was at work when Ms. Bragg picked up the victim on August 6, 2018, and that Mrs. Bennett made the exchange for him. He said he had to be at work at 5:30 a.m. but lived close to his place of work. Mr. Amburgey could not say when he was at Gordon Lane during July and August because he was in Smyrna "a lot" with his newborn son.

Mr. Amburgey testified that, on August 6, 2018, Ms. Bragg brought the victim to his work, and the victim told him what had occurred. He confirmed that the victim's disclosure to him was consistent with her statements in the forensic interview video. As a result of the victim's disclosure, Mr. Amburgey asked the Defendant to move out of Gordon Lane, and the victim had not been around the Defendant since.

Barbara Bennett, the Defendant's wife and the victim's grandmother, testified that she lived with her son at Gordon Lane. She agreed that when her son was called into work for a twelve-hour shift, she would sometimes watch the victim. Mrs. Bennett recalled the night of August 5, 2018. Mr. Amburgey came home, knocked on her bedroom door, and asked Mrs. Bennett to care for the victim in the morning because he had to be at work. She said that it was not unusual for her to oversee the exchange with Ms. Bragg. She recalled that Mr. Amburgey left for work at 5:45 a.m. to be at work by 6:00 a.m.

Mrs. Bennett testified that Ms. Bragg had been working the night before in Bellevue, a distance from Gordon Lane. When Ms. Bragg arrived, she asked to use the bathroom. Mrs. Bennett had gotten the victim out of bed and was helping her get ready to leave. Mrs. Bennett recalled that Ms. Bragg remained in the bathroom for some time, causing her to

check on Ms. Bragg.  Shortly thereafter, Ms. Bragg exited the bathroom and left with the victim.  Mrs. Bennett said that the victim was never left with the Defendant unsupervised.

After hearing this evidence, the jury convicted the Defendant of aggravated rape of a child, aggravated sexual battery, and assault by offensive touching.  The trial court sentenced the Defendant to concurrent sentences of fifty years for the aggravated rape of a child conviction, ten years for the aggravated sexual battery conviction, and six months for the assault by offensive touching conviction, for a total effective sentence of fifty years in the Tennessee Department of Correction.  It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it found the victim competent to testify; (2) the trial court erred when it allowed the victim's mother to be present during the victim's testimony; (3) the trial court erred in admitting the victim's forensic interview; (4) the victim failed to identify the Defendant at trial; and (5) the cumulative effect of these errors undermined the Defendant's right to a fair trial.  The State asks this court to affirm the judgments in all respects.

### A. Competency to Testify

The Defendant asserts that the trial court abused its discretion when it found the five-year-old victim competent to testify "despite her demonstrated inability to understand basic questions or to relate facts coherently under oath."  The State responded that the trial court did not abuse its discretion because the victim demonstrated that she knew the difference between a truth and a lie, the victim stated that one gets in trouble if they lie, and she promised to tell the truth.  We agree with the State.

Tennessee Rule of Evidence 601 provides that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute." "Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." Tenn. R. Evid. 601, Advisory Comm. Com.  When examining a child's competency to testify the trial court should determine whether the child understands the nature and meaning of an oath, has the intelligence to understand the subject matter of the testimony, and is capable of relating the facts accurately. *State v. Fears*, 659 S.W.2d 370 (Tenn. Crim. App. 1983).  The purpose of determining competency of the witness in child sexual abuse cases is to allow a victim to testify if it can be determined that the child understands the necessity of telling the truth while on the witness stand. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993).  The question of competency is a matter left to the discretion of the trial court. *State v. Caughron*, 855 S.W.2d 526, 538

(Tenn. 1993). The trial court's determination on competency will not be overturned absent a showing of an abuse of discretion. *State v. Howard*, 926 S.W.2d 579, 584 (Tenn. Crim. App. 1996).

After a thorough review of the record, we find that the trial court did not abuse its discretion when it determined that the victim was competent to testify. The record demonstrates that the victim understood the nature of her oath. The victim knew that telling a lie got her "in trouble" and that telling the truth did not. Although the victim had difficulty articulating the "difference" between a truth and a lie, such perfection is not required for her to be deemed competent to testify. Through direct questioning, the trial court determined that the victim knew the difference between a truth and a lie, and the victim promised to tell the truth. The interview satisfied the requirements necessary to establish the competency of a child witness and demonstrated that the child witness understood the importance of telling the truth. Therefore, the Defendant is not entitled to relief on this issue.

### B. Sequestration of Witnesses

The Defendant couches this issue in terms of the trial court's failure to remove the victim's mother and grandmother from the courtroom, a matter of sequestration. However, his argument appears to be that the victim's mother and grandmother were "unduly and unfairly influencing" the victim's testimony.

In the order denying a new trial, the trial court addressed this issue as follows:

> Defendant asserts the Court erred by denying his request to exclude [the victim]'s mother from the courtroom to prevent her from "coaching" or "influencing" the victim. The State argued in the instant hearing and its written motion that the parent of a minor child victim is permitted in the courtroom under the Victim Bill of Rights. Tenn. Const. Art. I, § 35. Therefore the mother, as the victim's representative, was lawfully present.
>
> The Court is not required to pre-emptively exclude an individual from court proceedings, particularly the parent of a minor child victim, on an unfounded basis that something might happen. The Court does recall Defendant stopping the child's testimony with a loud outburst asserting the mother was telling [the victim] what to say on the stand. However, the mother was seated quietly in the gallery. A very young child seeking out a familiar face in a stressful situation does not equate with Defendant's assertion that the mother was coaching a response. The Court does not find that Defendant established this ground. This claim is without merit.

12

The Defendant has failed to show that the trial court abused its discretion. First, the objection to the alleged behavior was not properly made. The Defendant was represented by an attorney. As such, it was the attorney's role to lodge any appropriate objections to the trial proceedings based upon the Tennessee Rules of Evidence. Here, the Defendant interjected, asserting that the victim's mother was nodding her head. The trial court found that this was not the case and proceeded. The Defendant's attorney lodged no objection, did not request a mistrial, or any other remedy during or following this incident. Even assuming a proper objection based upon an evidentiary rule, the trial court found that "the mother was seated quietly in the gallery." Our review of the record reveals nothing to indicate the victim's testimony was improperly influenced by her mother and grandmother. Ms. Bragg was present as the child's representative, there is no evidence of coercion, and the trial court found no grounds for sequestration. Therefore, the Defendant has failed to prove that the trial court abused its discretion. The Defendant is not entitled to relief as to this issue.

## C. Admission of Forensic Interview

The Defendant contends that the trial court erred when it allowed the jury to view the forensic interview because there was "no evidentiary reason to allow the jury to hear the victim's prior consistent statements." Generally, prior consistent statements are not admissible to bolster a witness's credibility. *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). Tennessee Code Annotated section 24-7-123 allows the State to introduce a recorded forensic interview under certain circumstances.

A recording may be admitted if the child testifies at trial, under oath, that the video is "a true and correct recording of the events" and is available for cross-examination, as was the case here. *Id.* § 24-7-123(b)(1). The trial court must find in a hearing that the video "possess[es] particularized guarantees of trustworthiness." *Id.* § 24-7-123(b)(2). The statute then lists the following considerations for the court as it determines the trustworthiness of the recording:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

13

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b); provided, however, that an interview shall not be inadmissible solely because the interviewer is employed by a child advocacy center that:

(i) Is not a nonprofit corporation, if the child advocacy center is accredited by a nationally recognized accrediting agency; or

(ii) Employs an executive director who does not meet the criteria of § 9-4-213(a)(2), if the executive director is supervised by a publicly elected official;

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

14

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;
(ii) Criminal justice;
(iii) Clinical evaluation;
(iv) Counseling; or
(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;

(G) Had no criminal history as determined through a criminal records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape or by other similar audiovisual means;

(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

*Id*. § 24-7-123(b)(2015).

There is a copy of the State's motion to introduce a recording of the forensic interview in the record, but there is not a transcript of the hearing. The State, however, references the hearing in its argument at the motion for new trial, and the trial court made the following findings as to this issue:

15

Defendant asserts the forensic interview was admitted as evidence without proper authentication. The State countered that a lengthy pretrial hearing to determine admissibility was conducted by the Court. The Court observes that the State filed a notice of intent that a recording of [the victim]'s forensic interview would be offered into evidence and requested a pretrial hearing. This notice was filed in January 2020. The Court recalls that it conducted a pre-trial hearing on July 7, 2021 and continued the hearing on July 8, 2021. The Court heard from Charlsi Legendre, then the executive director of Nashville Children's Alliance. Through Ms. Legendre's responses, the State affirmed to the Court the recorded forensic interview, the child advocacy center, and the forensic interviewer conformed to the factors established in Tenn. Code Ann. § 24-7-123.

At the conclusion of the pretrial hearing and having viewed the video recorded interview, the Court found the statements made by [the victim] were sufficiently trustworthy and that the State had met the statutory burdens for admissibility and authenticity. The Court observed that [the victim] would still need to qualify as a witness at trial, identify the recording, and confirm the statements within were true and correct. Thus, the Court cannot find that Defendant has established this ground.

Notably, the Defendant does not contest that the hearing was held or the trial court's findings with respect to the reliability of the recording. He maintains only that the victim's testimony was inadmissible. We do not agree. The trial court followed the statutory requirements and admitted the interview pursuant to Tennessee Code Annotated section 24-7-123. The admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). The trial court did not abuse its discretion. Therefore, the Defendant is not entitled to relief as to this issue.

### D. In-Court Identification

The Defendant argues that he is entitled to a new trial because the victim did not identify him in court. The State responds that the victim was not required to make an in-court identification of the Defendant. We agree with the State.

The identity of a defendant is a question of fact solely for the jury. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App.1982). An in-court identification is not required as long as the jury can reasonably determine or infer a defendant's identity from the testimony of witnesses. *State v. Phillips*, 728 S.W.2d 21, 25 (Tenn. Crim. App. 1986).

16

As to this issue the trial court made the following findings:

> The Court acknowledged that [the victim] was not asked to stand up and point out Defendant during her live testimony. However, [the victim] clearly stated in the forensic interview shown to the jury that "Jacque" was the person who touched her and that he lived with her grandmother. She also stated the incidents happened at [the victim]'s father's house where Defendant lived with [the victim]'s grandmother. Thus the Court and the jurors could find that [the victim] did identify her alleged abuser as Defendant.

At trial, the victim, Ms. Bragg, Mr. Amburgey, and Mrs. Bennett all testified that the Defendant lived at Gordon Lane with Mrs. Bennett, the Defendant's wife, at the time of these events. The victim's testimony about the identity of the person who touched her, "Jacque" who lived at "Daddy's house," was consistent with the information she provided in her forensic interview. This evidence is sufficient to allow a jury to reasonably determine the Defendant's identity. The Defendant is not entitled to relief as to this issue.

## E. Cumulative Error

Lastly, the Defendant contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the Defendant's issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

s/ *ROBERT W. WEDEMEYER*
ROBERT W. WEDEMEYER, PRESIDING, JUDGE
